**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ANTONIO OSEGUERA CERVANTES, also known as “Tony Montana,” “Chueho,” “Joel Mora Garibay,” “Tono,” “T.M.,” and “El 4,”**<br><br>**Defendant.** | **CRIMINAL NO. 23-CR-027 (BAH)** |

# GOVERNMENT’S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, respectfully submits this sentencing memorandum for the above-captioned matter. On July 31, 2026, Defendant Antonio Oseguera Cervantes, also known as “Tony Montana,” “Chueho,” “Joel Mora Garibay,” “Tono,” “T.M.,” and “El 4” (“Defendant”) pled guilty pursuant to a Plea Agreement to the two-count Indictment, charging conspiracy to distribute cocaine and methamphetamine for unlawful importation into the United States (“Count One”) and using, carrying, and possessing a firearm during and in relation to Count One (“Count Two”). For the reasons discussed herein, the Government requests that the Court sentence Defendant to 360 months of imprisonment, five years of supervised release, and a mandatory $200 special assessment. The Government’s recommended sentence falls below the U.S. Sentencing Guidelines (“Guidelines” or “U.S.S.G.”) range, as calculated by the parties and the Probation Office, due to Defendant’s age and health conditions. Defendant is subject to a ten-year mandatory minimum sentence for Count One and a consecutive five-year mandatory minimum sentence for Count Two.

## I. INTRODUCTION

In July 2001, Defendant was deported from the United States to Mexico after serving a federal prison sentence for conspiracy to distribute heroin. He was about forty-three years old then.

Shortly after his deportation, by around 2002, he resumed his illicit activities in Mexico by obtaining precursor chemicals for the production of methamphetamine destined for the United States. Since then and for two decades, Defendant worked to pour tonnage quantities of cocaine and methamphetamine into the United States, until he was arrested for unspecified local charges in Mexico in 2023. He was then expelled to the United States in 2025 to face federal charges in this case.

Compared to his criminal history in the United States, Defendant's later illicit activities in Mexico were significantly more serious. While he conspired to distribute heroin in the United States, he escalated his illicit activities in Mexico to obtaining precursor chemicals, overseeing narcotics sales, protecting cartel territories from rivals, supervising and maintaining methamphetamine laboratories, and managing drug trafficking and money laundering activities while armed.

And he did the above crimes in Mexico while working for and with notorious drug cartels. From approximately 2002 to 2010, Defendant worked in a leadership position for the Milenio Cartel, which was based in Jalisco, Mexico. In 2010, after the top leader of the cartel was arrested, its armed faction separated to create *Cártel de Jalisco Nueva Generación* ("CJNG"), one of the most prolific and brutal cartels in Mexico's history. Defendant's brother, Nemesio Oseguera Cervantes, also known as "El Mencho" ("Mencho"), assumed CJNG's top leadership position, while Defendant reported directly to Mencho. Since then, the CJNG worked closely with another violent cartel named Los Cuinis, which was founded and led by Mencho's extended family members, the Gonzalez-Valencia brothers.[1]

[1] This Court has already sentenced two of the Gonzalez-Valencia brothers, Gerardo and Jose, for drug distribution conspiracies. The case of another brother, Abigael, is pending before the Court.

For decades, the Milenio Cartel, the CJNG, and Los Cuinis wreaked havoc in Mexico and flooded the United States and other countries with drugs. Defendant was an armed leader and willing enabler all along, while also taking steps to insulate himself and avoid law enforcement detection.

## II. FACTUAL BACKGROUND

### A. Offense Conduct

The following facts are drawn from the Joint Statement of Stipulated Facts. Dkt. No. 33 ("SOF").

From at least in or about 2002 to December 20, 2022, in Mexico, the United States, and elsewhere, Defendant knowingly, intentionally, and willfully conspired to distribute at least 450 kilograms of cocaine and at least 45 kilograms of methamphetamine for unlawful importation into the United States. *Id.* ¶ 1. During and in furtherance of that conspiracy, Defendant was armed with a pistol when attending meetings to discuss drug trafficking and to collect narcotics proceeds. *Id.* ¶¶ 1, 7.

Starting in or around 2002, Defendant obtained precursor chemicals for the production of methamphetamine. *Id.* ¶ 2. From around 2002 to 2010, Defendant operated out of Jalisco, Mexico, as a member of the Milenio Cartel. *Id.* ¶ 3. In Jalisco, Defendant oversaw narcotics sales in certain areas, protected those areas from rival cartels, received precursor chemicals for the production of methamphetamine, and maintained and supervised the operations of methamphetamine laboratories. *Id.* During that timeframe, Defendant trafficked methamphetamine and cocaine into the United States and had at least five participants working under his supervision. *Id.*

In around 2010, after the leader of the Milenio Cartel was arrested, Defendant's brother, Mencho, and others formed the CJNG. *Id.* ¶ 4. Mencho assumed CJNG's top leadership position.

*Id.* CJNG's drug trafficking activities were and remain extensive, with more than five participants. *Id.* The CJNG was and remains closely aligned with another drug trafficking organization named Los Cuinis. *Id.*

Defendant worked with, and reported to, Mencho. *Id.* ¶ 5. Defendant received precursor chemicals and arranged for their transportation to CJNG methamphetamine laboratories. *Id.* Defendant also received cocaine shipments from Los Cuinis for further distribution. *Id.* Additionally, Defendant was responsible for receiving CJNG drug proceeds and managing CJNG money laundering activities—including the transfer of CJNG drug proceeds from the United States to Mexico through *casas de cambio*, or currency exchange locations. *Id.*

During Defendant's participation in the charged conspiracy, the CJNG manufactured and distributed multi-tonnage quantities of methamphetamine and, in coordination with Los Cuinis, distributed multi-tonnage quantities of cocaine. *Id.* ¶ 6. Defendant knowingly helped the CJNG distribute at least 45 kilograms of methamphetamine and at least 450 kilograms of cocaine for importation into the United States. *Id.* ¶¶ 6, 9.

Defendant communicated with co-conspirators via BlackBerry Messenger ("BBM") under several screen names, including "T.M." and "Tony." *Id.* ¶ 8. In BBM communications in or around 2013, he discussed with other co-conspirators routes to transport drugs to avoid law enforcement detection, precursor chemicals, and methamphetamine production and transportation. *Id.* For instance, on or around June 10, 2013, Defendant and a co-conspirator discussed the 60-kilogram capacity of a truck's hidden compartment to transport methamphetamine destined for the United States. *Id.* As another example, on or around September 4, 2013, Defendant and a co-conspirator discussed a shortage of a methamphetamine precursor chemical they called "deodorant." *Id.*

**B. Procedural History**

On January 24, 2023, a federal grand jury sitting in the District of Columbia returned an Indictment charging Defendant with conspiracy to manufacture and distribute five kilograms or more of cocaine and 500 grams or more of methamphetamine, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), 960(b)(1)(H), and 963, and using, carrying, and possessing a firearm in furtherance of Count One, in violation of 18 U.S.C. §§ 924(c) and 2. Dkt. No. 1.

On March 23, 2023, while already in custody in Mexico on local charges, Defendant was served with the arrest warrant in this case and remained in continuous custody until he was expelled from Mexico to the United Stated on February 27, 2025. The following day, Defendant made his initial appearance in this District and was arraigned on the Indictment.

On July 31, 2026, Defendant pled guilty to the Indictment, pursuant to a Plea Agreement. Dkt. Nos. 32-33 (Plea Agreement and Joint Statement of Stipulated Facts). Under that agreement, the Government must seek a sentence not exceeding 360 months' imprisonment. Dkt. No. 32 ("PA"), at 3.

**III. PRESENTENCE INVESTIGATION REPORT**

**A. Statutory Penalties**

On Count One, Defendant faces a mandatory minimum sentence of ten years' imprisonment, a maximum sentence of life imprisonment, a fine not to exceed the greater of twice the amount authorized under Title 18 or $10,000,000, and a term of supervised release of at least five years. *Id.* ¶ 2. On Count Two, Defendant faces a mandatory minimum sentence of five years' imprisonment, a maximum sentence of life imprisonment, a fine not to exceed $250,000, and a

term of supervised release of not more than five years. *Id.* The sentence for Count Two must be consecutive to any sentence imposed on Count One. *Id.* Defendant is ineligible for relief under the zero-point offender and safety valve provisions. *Id.* ¶ 3(e).

### B. Sentencing Guidelines Calculation

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, not mandatory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*; *United States v. Booker*, 543 U.S. 220, 222 (2005) (holding that the Guidelines were not mandatory). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

On October 26, 2026, the Probation Office issued a final Presentence Investigation Report, Dkt. No. 38 ("PSR"), and a sentencing recommendation of an aggregated term of 240 months' imprisonment. Dkt. No. 39, at 1. The PSR's Guidelines calculation mirrors the parties' calculations in the Plea Agreement. PSR ¶¶ 4-8, 28-43; PA ¶ 3.

For Count One specifically, based on the drug quantity for which Defendant is responsible—450 kilograms or more of cocaine and 45 kilograms or more of methamphetamine—and pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), the Probation Office calculated Defendant's base offense level at 38. PSR ¶ 30. The Probation Office also applied the following sentencing enhancements: a two-level increase because the offense involved the importation of methamphetamine under U.S.S.G. § 2D1.1(b)(5); a two-level increase because Defendant maintained premises for the manufacturing or distribution of a controlled substance, i.e.,

methamphetamine, under U.S.S.G. § 2D1.1(b)(12); and a four-level increase for being an organizer or leader of the criminal activity at issue, under U.S.S.G. § 3B1.1(a). *Id.* ¶¶ 31-32, 34. The PSR also notes that Defendant is ineligible for a zero-point offender reduction, pursuant to U.S.S.G. § 4C1.1(a)(1), (7) and (10). *Id.* ¶ 40 (noting ineligibility due to Defendant's criminal history points, possession of a firearm in relation to the offense, and aggravating role, respectively). Defendant is also ineligible for relief under the safety valve provision, pursuant to U.S.S.G. § 5C1.2. *Id.* ¶¶ 8, 28. The total offense level for Count One, after a three-level reduction for timely acceptance of responsibility under U.S.S.G. § 3E1.1(a)-(b), is 43. *Id.* ¶ 41.

As to Count Two, the PSR notes that the Guidelines sentence is the statutory mandatory minimum term of 60 months' imprisonment, which shall apply consecutively to the sentence for Count One. *Id.* ¶¶ 7, 43, 84.

The Probation Office calculated Defendant's criminal history as Category III, consistent with the Plea Agreement. *Id.* ¶¶ 4, 51; PA at 3. Accordingly, based on a total offense level of 43 and a criminal history Category III, Defendant's Guidelines range for the underlying offenses is life plus five years' imprisonment. PSR ¶¶ 7, 85-86; PA at 3. His Guidelines range for any fine is $50,000 to $10,000,000. PSR ¶ 112.

## IV. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

After calculating the applicable Guidelines range, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In doing so, a district court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Id.* at 39.

Some of the factors courts must consider pursuant to § 3553(a) include: the nature and circumstances of the offense (§ 3553(a)(1)); the history and characteristics of the defendant (same);

the need for the sentence to reflect the seriousness of the offense and promote respect for the law (§ 3553(a)(2)(A)); the need for the sentence to afford adequate deterrence (§ 3553(a)(2)(B)-(C)); and the need to avoid unwarranted sentence disparities among defendants with similar records and conduct (§ 3553(a)(6)). In this case, all § 3553(a) factors weigh in favor of the lengthy recommended term of incarceration.

### A. The Nature and Circumstances of the Offense, and the Need for the Sentence to Reflect the Severity of the Offense and Promote Respect for the Law

Defendant's decades-long conduct compels a significant sentence. Beyond procuring precursors and trafficking cocaine and methamphetamine, Defendant was a high-ranking leader for at least two cartels, who supervised laboratories, oversaw drug sales, and had enough standing within the CJNG to report directly to Mencho and manage the collection and laundering of the coveted drug proceeds. SOF ¶¶ 2-3, 5. And he did the above while armed. *Id.* ¶ 7.

Moreover, Defendant committed these offenses knowing that he was participating in and promoting a violent enterprise. For example, that Defendant was armed "when attending meetings to discuss drug trafficking and to collect narcotics proceeds" suggests that he was at least aware of the potential need to engage in acts of violence in furtherance of the charged conspiracy. *See id.* As another example, "protect[ing]" narcotics territories "from rival cartels" requires use of violence; therefore, at a minimum, Defendant must have known the violence required to protect and run the Milenio Cartel. *See id.* ¶ 3. Rival cartels rarely settle disputes through diplomacy alone. And while there may be no nonviolent drug cartels in Mexico, Defendant was a member of particularly brutal cartels.

The scale of the charged conspiracy was also extensive, with incalculable harm. "The CJNG's drug trafficking activities were and remain extensive." *Id.* ¶ 4. "[T]he CJNG manufactured and distributed multi-ton quantities of methamphetamine, and in coordination with Los Cuinis,

distributed multi-ton quantities of cocaine." *Id.* ¶ 6. Those facts imply instability in several countries and untold devastation and destruction. For instance, when sentencing Gerardo Gonzalez-Valencia, a former leader of Los Cuinis, the Court noted that the underlying conduct was "extensive," "long-term," and "among the most serious of drug trafficking offenses," which "led to instability in Mexico, instability along the border of our country," and "significant damage to communities in the United States." Exhibit A at 48:7-15, 50:22-25.

Therefore, the recommended 360-month sentence is warranted to adequately reflect the nature and severity of the underlying offenses and promote respect for the law.

**B. The History and Characteristics of Defendant**

Defendant's history contains mitigating factors. Starting with the first mitigating factor and crediting his history as stated in the PSR, [redacted] *Id.* Therefore, Defendant's early history, while not an excuse, could have aggravated his later struggles with leading a lawful life.

[redacted] *Id.* ¶ 69. Defendant's above-noted health conditions are an appropriate factor for the Court to consider when imposing a sentence. *See, e.g.*, *United States v. Turner*, 531 F. Supp. 2d 123, 127 (D.D.C. 2008) (noting courts' discretion to consider a defendant's health "in determining a reasonable and appropriate sentence pursuant to 18 U.S.C. [§] 3553(a)"); *see also United States v. Irizarry-Sisco*, 87 F.4th 38, 51 (1st Cir. 2023) (considering defendant's age and health problems as part of § 3553(a) factors, as well as "the Bureau of Prisons' ability to provide proper medical care").

Therefore, the recommended sentence of 360 months' imprisonment is sufficient but not greater than necessary to address the severity of the conduct and record here, while reflecting the above mitigating factors as well.

**C. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence is a major sentencing factor in this case, given Defendant's criminal history, involvement with at least three violent drug trafficking cartels, and his high-ranking role in the

underlying conspiracy. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by a given defendant. 18 U.S.C. § 3553(a)(2)(B)-(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010) (discussing goals of general and specific deterrence).

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). As stated, the underlying conspiracy involved three prolific and violent cartels. The CJNG, specifically, runs its own expansive drug operations and routes, but also reinforces other allies and is reinforced by them, thereby multiplying its reach and harm. For example, the CJNG has distributed multi-tonnage quantities of cocaine, which Los Cuinis supplied from South America through its trafficking routes and networks. *See* SOF ¶ 6; *see also* Exhibit B at 6:8-7:6 (transcript of law enforcement testimony during evidentiary hearing for Gerardo Gonzalez-Valencia's case on May 4, 2023, regarding family links between Los Cuinis and the CJNG and their joint operations).

To enforce its agenda and generate profits, the CJNG, much like the Milenio Cartel and Los Cuinis, bribes, intimidates, tortures, kidnaps, and kills—mainly through operatives it recruits and maintains. Since its inception, the CJNG leaders and operatives have acted with a profound sense of impunity, which underscores the need for significant deterrence. Here, from early 2000s, Defendant not only committed crimes personally, but he also led, supervised, managed, and enabled others to grow and protect cartels—encouraging and enticing cartel members deeper into a life of crime. The recommended sentence can help send a clear and consistent message to all existing and would-be drug traffickers—from the current leadership to lower-level members who

by their actions sustain and grow the CJNG and other cartels—that punishment by the U.S. criminal justice system is certain and severe.

***Specific Deterrence***

Defendant's criminal history shows a serious risk of recidivism. He has three convictions for drug-related offenses from the 1990s, while he was in his thirties. The most recent of those was a 1996 conviction for conspiracy to distribute heroin, for which he received a 63-month imprisonment sentence. After serving that sentence, he was deported to Mexico in July 2001 and almost immediately, by around 2002, he escalated his criminal conduct in the underlying conspiracy. *See* PSR ¶¶ 46-47 (sustaining convictions for "Simple Cocaine" and "Accessory" offenses in 1991, then being convicted for conspiracy to distribute heroin in 1996, and then upon his release and deportation, joining the charged international drug trafficking conspiracy).

Beyond that, due to his high-ranking position within the CJNG and familial links to its top-tier leaders, specific deterrence is particularly important in this case to prevent Defendant from tapping into his resources and familial relationships to return to the CJNG. Notably, Defendant's nephew, Juan Carlos Valencia Gonzalez, also known as "Pelon," is a fugitive indicted in this District and the current top leader of the CJNG. *See United States v. Juan Carlos Valencia Gonzalez*, No. 20-216 (D.D.C. filed Oct. 8, 2020) (indicted for the same offenses as charged in this case).[2] Defendant's other family member, Julio Alberto Castillo Rodriguez, is also a fugitive and a senior member of the CJNG. *See United States v. Julio Alberto Castillo Rodriguez*, No. 22-

---

[2] *See also* Narcotics Rewards Program, *Juan Carlos Valencia Gonzalez*, U.S. Dep't of State (Oct. 26, 2026, 6:30 pm), https://www.state.gov/juan-carlos-valencia-gonzalez (describing Valencia Gonzalez as "the new leader of" the CJNG and offering up to $25 million reward "for information leading to [his] arrest and/or conviction").

346 (D.D.C. filed Oct. 20, 2022) (indicted for the same offenses as charged in this case).[3] While familial ties in many cases are a welcome and important factor to prevent recidivism, here they can be a post-release landing base for Defendant to continue a life of crime.[4] *See* PSR ¶¶ 58, 63 ([redacted]" and Mencho, who was the top leader of the CJNG until February 2026, [redacted]).

The above record requires a sentence severe enough to prevent any further opportunities for Defendant to commit crimes. The recommended sentence can be a meaningful step to protect the public and impress on Defendant that prison is not just a cost of doing business, or a revolving door that presents opportunities to commit worse crimes.

**D. Unwarranted Sentencing Disparities**

Finally, § 3553(a)(6) requires a specific evaluation of similarly situated defendants "to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." When determining whether a sentence creates an unwarranted disparity, courts should consider, *inter alia*, a defendant's criminal history, total offense level, Guidelines range, acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, and whether and to what extent cooperation was a factor at sentencing.

---

[3] *See also* Narcotics Rewards Program, *Julio Alberto Castillo Rodriguez*, U.S. Dep't of State (Oct. 26, 2026, 6:30 pm), https://www.state.gov/julio-alberto-castillo-rodriguez (describing Castillo Rodriguez as "a senior member" of the CJNG and offering up to $15 million reward "for information leading to [his] arrest and/or conviction").

[4] Other family members whom this Court has sentenced for CJNG-related offenses include Defendant's nephew, Ruben Gonzalez-Valencia, the former second-in-command of the CJNG, and Defendant's niece, Jessica Oseguera Gonzalez. *See United States v. Ruben Gonzalez-Valencia*, No. 16-229 (D.D.C. Mar. 7, 2025) (sentenced to life-plus-thirty-years' imprisonment); *see also United States v. Jessica Johanna Oseguera Gonzalez*, No. 20-040 (D.D.C. June 11, 2021) (sentenced to 30 months' imprisonment for sanctions violations).

*See, e.g.*, *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" and not unwarranted due to differences in conduct). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

The proposed 360-month sentence would not create an unwarranted sentencing disparity between similarly situated defendants. For two decades, Defendant supplied illicit laboratories in Mexico—some of which he maintained and supervised—with chemicals needed to manufacture methamphetamine destined for the United States. SOF ¶¶ 2-3, 5. He distributed and trafficked cocaine and methamphetamine just as long, first as a leader in the Milenio Cartel, who oversaw narcotics sales, and later as a high-ranking member of the CJNG. *Id.* ¶¶ 3, 5. For instance, in his electronic communications in 2013, Defendant discussed the capacity of a truck's hidden compartment to transport methamphetamine into the United States. *Id.* ¶ 8. He acknowledged that during his participation in the charged conspiracy, the CJNG alone manufactured and distributed multi-tonnage quantities of methamphetamine and distributed multi-tonnage quantities of cocaine, which he helped distribute for importation into the United States. *Id.* ¶ 6. He also protected narcotics territories from rival cartels and was armed with a pistol in furtherance of his drug trafficking and money laundering activities. *Id.* ¶¶ 3, 7.

The recommended 360-month sentence is sufficient but not greater than necessary to account for the factors in § 3553(a). The recommended sentence is lower than the Guidelines range and slightly lower than the average and median sentences noted in the PSR for similarly situated defendants, i.e., 410 and 470 months of imprisonment, respectively, because it accounts for Defendant's age and health conditions. *Id.* ¶ 122 (noting "6 defendants whose primary guideline

was § 2D1.1 and Powder Cocaine was the primary drug type"). The Government has identified similar cases as presented below, which suggest the recommended sentence would not lead to unwarranted disparities. In selecting these cases, the Government considered the defendants' conduct, Guidelines range, criminal history, extent of cooperation, acceptance of responsibility, and sentence.[5]

**Jose Gonzalez-Valencia, 16-CR-65-002 (D.D.C.)**

Jose Gonzalez-Valencia pled guilty to conspiracy to distribute cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959, 960(a)(3), 960(b)(1)(B)(ii), and 963, and 18 U.S.C. § 2. For over a decade, Gonzalez-Valencia was a leader of Los Cuinis, leading the cartel with his brothers, Gerardo and Abigael. Gonzalez-Valencia regularly purchased and invested in multi-tonnage quantities of cocaine, which were transported from Colombia to Mexico and then imported into the United States, including through semi-submersible vessels. He also financed and supported CJNG's creation and supplied rifles and ammunition to the CJNG. Gonzalez-Valencia carried a firearm in furtherance of the conspiracy and directed the murder of a rival cartel member who allegedly had stolen a 1,000-kilogram cocaine shipment from Los Cuinis. He was held responsible for over 450 kilograms of cocaine.

Gonzalez-Valencia's based offense level was 38. He received a four-level leadership role enhancement; a two-level enhancement for importing cocaine using a semi-submersible vessel; a two-level enhancement for possession of a firearm; another two-level enhancement for engaging in acts of violence; and a three-level reduction for acceptance of responsibility. Following these adjustments, his total offense level was 45, which with a criminal history Category I, led to a

[5] [redacted]

Guidelines range of life imprisonment. This Court sentenced the 49-year-old Gonzalez-Valencia to 360 months of imprisonment.

Gonzalez-Valencia's case is a good comparator because he also received a downward variance based on unique circumstances: He had been extradited from Brazil pursuant to a treaty that required the Government to seek a sentence of no more than 360 months' imprisonment. While the same factor is not present here, Defendant's age and serious health conditions are meaningful considerations that warrant a downward variance from life imprisonment. *See* PSR ¶ 118 (noting "the Court may consider whether a downward variance is warranted to account for the defendant's age and serious medical circumstances"). Therefore, the recommended sentence will not cause unwarranted sentence disparities between these two cases.

**<u>Gerardo Gonzalez-Valencia, 16-CR-65-001 (D.D.C.)</u>**

Gerardo Gonzalez-Valencia pled guilty to conspiracy to distribute cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959, 960(a)(3), 960(b)(1)(B)(ii), and 963, and 18 U.S.C. § 2. For over thirteen years, Gonzalez-Valencia led Los Cuinis with his two brothers, Jose and Abigael, regularly purchased bulk cocaine shipments from Colombia for transportation to Mexico and importation into the United States, and personally invested in multi-tonnage quantities of cocaine destined for the United States. He also financed and supported the CJNG from its inception in 2010 until his arrest in 2016.

Gonzalez-Valencia pled guilty without a plea agreement, admitted to a barebones statement of facts, and contested several sentencing factors, including enhancements, which led to a contested sentencing in 2023 that lasted almost three days. After hearing testimony from four Government witnesses, including three cooperating witnesses, this Court calculated Gonzalez-Valencia's Guidelines range as follows: a base offense level of 38; a four-level leadership role

enhancement; a two-level enhancement for possession of a firearm; a two-level enhancement for engaging in acts of violence for the directed murder of a rival; another two-level increase for importing cocaine using a semi-submersible vessel; and a three-level reduction for acceptance of responsibility. Following these adjustments, Gonzalez-Valencia's total offense level was 45, which with a criminal history Category III, led to a Guidelines range of life imprisonment. This Court sentenced Gonzalez-Valencia to life imprisonment, when he was 45 years old.

Although Defendant too faces a Guidelines range of life imprisonment, several factors support the Government's recommended 360-month sentence. In addition to his age, Defendant [redacted] Moreover, although the four-level role enhancement is warranted in this case, it bears noting that unlike Gonzalez-Valencia, Defendant was not a top leader and the facts in this case do not include directed murder. Therefore, the Government's recommended 360-month sentence is substantially the same as a life imprisonment sentence, which would not cause unwarranted sentencing disparities but will reflect the nuanced differences between these two cases.

**Eleazar Medina-Rojas, 08-CR-057 (D.D.C.)**

Eleazar Medina-Rojas pled guilty to conspiracy to manufacture and distribute cocaine and marijuana for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963. He was a high-ranking member of "Los Zetas," a violent drug trafficking organization comprised primarily of former Mexican military officers. Medina-Rojas oversaw

aspects of the cartel's drug trafficking activities in Mexico. For instance, he was responsible for enforcement actions and protection of drug trafficking routes, often through violence, threats of violence, and use of weapons; he personally participated in acts of violence against rival cartel members and had bodyguards armed with rifles. As another example, he was a "plaza boss" in Monterrey, Mexico, leading approximately 80 cartel members and controlling all drug trafficking activities within that territory. Medina-Rojas also coordinated the shipping of drugs hidden in trucks and vehicles from Mexico into the United States and received drug proceeds generated in the United States through vehicles crossing back into Mexico. He sold drugs for the cartel, invested in drug loads personally, and carried weapons in furtherance of drug trafficking. He was held responsible for over 450 kilograms of cocaine and 90,000 kilograms of marijuana.

Medina-Rojas's base offense level was 38. He received a four-level leadership role enhancement; a two-level enhancement for possession of a firearm; another two-level enhancement for using acts of violence against rival groups; and a three-level reduction for acceptance of responsibility. With a criminal history Category II and a total offense level of 43, Medina-Rojas's Guidelines range was life imprisonment. He was sentenced to 380 months of imprisonment, when he was 53 years old.

Defendant's Guidelines range, as determined by the parties and the Probation Office, is the same as Medina-Rojas's. Compared to Medina-Rojas, however, Defendant is about fifteen years more senior in age and has significant health conditions. Moreover, although the four-level role enhancement is warranted, it bears noting that Defendant's case does not involve an enhancement

for acts of violence. Therefore, the recommended 360-month sentence here would not lead to unwarranted sentencing disparities compared to Medina-Rojas.

**Jaime Gonzalez-Duran, 08-CR-057 (D.D.C.)**

Jaime Gonzalez-Duran pled guilty to conspiracy to manufacture and distribute cocaine and marijuana for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963. He left the Mexican military to join Los Zetas. He gained status within the cartel over time, working initially as a bodyguard and later as a plaza boss. As a high-ranking leader, he oversaw some aspects of the cartel's drug trafficking activities in Mexico, such as the transportation of wholesale quantities of cocaine from Colombia into Mexico for importation into the United States, as well as controlling certain territories. He bribed or attempted to bribe law enforcement officers to ensure drug loads would not be disturbed, and supervised cartel members who trafficked cocaine into the United States using tractor trailers. Gonzalez-Duran wore body armor and routinely carried, stored, and transported weapons to secure cartel territories. For example, he was responsible for storing and transporting a cache of 540 rifles, 165 grenades, 500,00 rounds of ammunition, and 14 sticks of TNT, which were seized. He also smuggled drug proceeds from the United States back into Mexico and was intercepted discussing the crossing of $1,449,860 from Texas into Mexico in just one instance. He also invested, with others, in a ten-ton cocaine shipment and participated in acts of violence over territory control.

Gonzalez-Duran's base offense level was 38. He received a four-level leadership role enhancement; a four-level enhancement for using body armor during the offense; a two-level enhancement for possession of a firearm; another two-level enhancement for using acts of violence against rival groups; a two-level enhancement for bribing or attempting to bribe a law enforcement officer; and a three-level reduction for acceptance of responsibility. With a criminal history

Category I and a total offense level of 49, Gonzalez-Duran's Guidelines range was life imprisonment. He was sentenced to 420 months of imprisonment, when he was 49 years old.

Compared to Gonzalez-Duran's case, the facts in this case do not include acts of violence directly attributable to Defendant, use of body armor, military background, transportation of significant quantities of firearms and ammunition, or bribery. Moreover, Defendant is about nineteen years more senior, with significant health conditions. Given these unique factual differences between the two cases, the recommended 360-month sentence would not cause unwarranted sentencing disparities between Defendant and Gonzalez Duran.

**Edgar Fabian Villasenor Garcia, 21-CR-480 (D.D.C.)**

Edgar Fabian Villasenor Garcia pled guilty to conspiracy to distribute cocaine and methamphetamine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), 960(b)(1)(H), and 963, and 18 U.S.C. § 2. For over five years and despite being a well-educated criminal lawyer in Mexico, Villasenor Garcia was a CJNG operative, who personally distributed cocaine and methamphetamine and carried a firearm in furtherance of the conspiracy. He knew that CJNG members and leaders used firearms, including to protect drugs and drug proceeds, to control CJNG members, to fight with rival criminal organizations, and to escape capture by law enforcement. He was held responsible for distributing at least 450 kilograms of cocaine and 780 kilograms of methamphetamine.

Villasenor Garcia's base offense level was 38. He received a two-level enhancement for possession of a firearm and another two-level enhancement for importation of methamphetamine. With a criminal history Category I and a total offense level of 39, Villasenor Garcia's Guidelines range was 262 to 327 months' imprisonment. This Court sentenced Villasenor Garcia to 250 months' imprisonment, which included a twelve-month downward departure pursuant to *United*

*States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994).

A sentence for Defendant less than the sentence Villasenor Garcia received, as recommended by the Probation Office, would result in an unwarranted sentencing disparity. *See* Dkt. No. 39, at 1 (Probation Office recommending a 240-month sentence). Whereas Villasenor Garcia received no leadership enhancement, Defendant was a high-ranking leader of at least two cartels for two decades. Unlike Defendant, Villasenor Garcia did not work directly with or report to Mencho, did not maintain and supervise methamphetamine laboratories, did not manage CJNG's money laundering activities, nor supervise narcotics sales. Villasenor Garcia also did not have criminal convictions, while Defendant is a recidivist whose family leads a major drug cartel in Mexico. *See* Exhibit A at 49:9-14 (noting prior conviction was "a serious consideration"). These differences more than justify the higher recommended sentence in this case to sufficiently reflect the gravity of Defendant's conduct, avoid sentence disparities, and rule out any further opportunity for Defendant to commit crimes—even in light of Defendant's age and medical conditions.

## V. CONCLUSION

For the reasons set forth above, the Government recommends 360 months of imprisonment, five years of supervised release, and a mandatory $200 special assessment.

//

//

//

//

//

//

//

Dated: October 29, 2026

Respectfully Submitted,

MARGARET A. MOESER, Chief
Money Laundering, Narcotics and
Forfeiture Section
Criminal Division
U.S. Department of Justice

*/s/ Lernik Begian*
Lernik Begian
Douglas Meisel
Trial Attorneys
Money Laundering, Narcotics and
Forfeiture Section
Criminal Division
U.S. Department of Justice
lernik.begian@usdoj.gov
douglas.meisel@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the Government's Sentencing Memorandum was served through the ECF filing system to counsel of record for Defendant this 29th day of October 2026.

By: *\/s/ Lernik Begian*

Lernik Begian
Trial Attorney
Money Laundering, Narcotics and
Forfeiture Section
Criminal Division
U.S. Department of Justice